IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ASHLEY MARIE KEEN )
)
v. ) No. 3:13-0053
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI), as provided under Titles II and XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 17). Plaintiff has further filed a reply in support of her motion for judgment. (Docket Entry No. 18) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Introduction

Plaintiff filed her DIB and SSI applications on October 8, 2008 and March 2, 2010, respectively, alleging a disability onset date of February 28, 2007. (Tr. 12) Plaintiff's claim was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her claim by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on March 6, 2012, when plaintiff appeared with counsel and gave testimony. (Tr. 355-75) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until April 30, 2012, when he issued a written decision finding plaintiff not disabled. (Tr. 12-21) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2. The claimant has not engaged in substantial gainful activity since February 28, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: systemic lupus erythematosus ("SLE"), anxiety disorder and obsessive-compulsive disorder ("OCD") (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can understand and remember simple and 1-3 step detailed tasks, maintain concentration, persistence or pace for 2 hour periods during the 8 hour workday, occasionally interact with the public, co-workers and supervisors and adapt to infrequent change in the workplace.

6.  The claimant is capable of performing past relevant work as a packer. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 14-16, 20-21)

On November 23, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 6-8), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from the government's brief, Docket Entry No. 17 at pp. 2-8:

A. Non-Medical Evidence

Keen was 36 years old at the time of the ALJ's decision (Tr. 21, 74, 101). She has earned a G.E.D. (Tr. 356). She has past relevant experience as a cashier, sandwich maker, packer, and laborer (Tr. 371-72). She alleges disability due to fibromyalgia, bipolar, schizophrenia, OCD, systemic lupus, chronic fatigue syndrome, and thyroid disease (Tr. 91). During the period she alleges disability, she testified that she was still able to perform various daily activities, including housework, painting rooms in her house, baking (including cakes, brownies, and muffins), cooking for her large family (including meals like chicken, pork chops, and fish), doing laundry, vacuuming, dusting, cleaning, and mopping (Tr. 364-66).

B. Medical Evidence

In February 2008, Keen began psychiatric treatment with Dr. Ahmed I. Farooque,

who initially diagnosed her with major depression, recurrent, with psychotic feature, obsessive-compulsive disorder, and panic disorder without agoraphobia (Tr. 274-75). Dr. Farooque noted that Keen stated she used to work, but could no longer due to her physical problems (Tr. 274). Keen told Dr. Farooque that she is obsessed with the number seven. Id. Dr. Farooque determined that Keen had a Global Assessment of Functioning (GAF) score of 50 (Tr. 275). At her next appointment, Dr. Farooque noted that Keen said things looked better for her, her anger and mood symptoms were better, and his impression was that there was already moderate improvement (Tr. 273). In June 2008, Keen told Dr. Farooque that her home situation was very difficult as there were many people living there, and she was, albeit rarely, still hearing a voice (Tr. 272).

On August 12, 2008, Keen saw Dr. Cindi Jones, an internist, for the first time in more than a year, to obtain medication and to discuss her disability application (Tr. 165). Keen reported feeling overwhelmed with her kids and did not understand why she was turned down for disability. Id. Dr. Jones denied Keen's request for Lortab. Id. Two weeks later, Keen called Dr. Jones stating she was in a car accident and again requested Lortab (Tr. 164). Dr. Jones again denied her request and asked Keen to have the related ER records sent to her. Id. There is no record of this accident from either the hospital or from Dr. Jones in the administrative record.

On October 3, 2008, Keen saw Dr. Farooque, who noted, inter alia, that he was "kind of doubtful about her medication compliance" (Tr. 271). On April 10, 2009, Keen saw Vicki Mitchell, FNP-C, to establish a new primary care provider relationship (Tr. 195-96). Keen complained of trouble eating, despite having gained 70 pounds, not being able to sleep, and right knee pain. Id. Ms. Mitchell's examination was unremarkable other than revealing a slight limp on the right. Id. On April 16, 2009, Keen had an X-ray of her cervical spine performed by Dr. Deborah Winters (Tr. 216). The X-ray revealed a straightening of the normal cervical alignment, but was otherwise unremarkable. Id. On April 28, 2009, Keen had a spectral analysis to evaluate her thyroid tissues performed by Dr. Winters (Tr. 215). Dr. Winters found that Keen's thyroid was of normal size, but the heterogeneity and increased vascularity throughout was compatible with thyroid disease for which clinical correlation was recommended. Id.

Between April 2009 and June 2009, Keen sought mental treatment from various providers at the Volunteer Behavioral Health Care System (Tr. 282-301). On April 30, 2009, Keen told Dr. Christopher Raggio at the clinic that she has to do everything 11 times (Tr. 300). On June 16, 2009, Keen told Candice Henslee, M. Ed., that she found out that morning that she only has 3-5 more years to live and was scared of dying soon (Tr. 287). There is no evidence of Keen receiving any such news from any medical provider. Although, Keen

4

promised to keep 100% of all her appointments and to tell her family members about her medical problems (Tr. 288), she cancelled her next appointment on June 22, 2009 and did not attend any further appointments with Ms. Henslee (Tr. 286, 282). Without any notes of objective mental health testing, Ms. Henslee assigned Keen a GAF score of 40 and included diagnoses of obsessive compulsive disorder and bipolar I disorder (Tr. 282).

After almost a year had passed since her last appointment with him, Keen returned to Dr. Farooque on July 8, 2009 (Tr. 269). Keen told Dr. Farooque that due to not having insurance she could not afford any of her medications since January 2009 and that things were not going well with her chaotic home situation. Id. In October 2009, Dr. Farooque again examined Keen, with similar complaints and results (Tr. 268).

On August 5, 2009, Kalyn Bowra, FNP, saw Keen for her knee pain (Tr. 193-94). Upon examination, Ms. Bowra found, inter alia, that Plaintiff had a midposition gait and station without abnormalities; tenderness and mild effusion on palpation on knees; decreased muscle strength in knees bilaterally; full range of motion in knees bilaterally, but pain with full extension and full flexion; no knee subluxation, dislocation or laxity; pain with collateral ligaments tests bilaterally – no popping present; a positive McMurray's test; good coordination; and normal deep tendon reflexes. Id.

On August 18, 2009, Keen underwent a thyroid and abdominal analysis (Tr. 209-10). Dr. Winters found, inter alia, that Keen had increased vascularity throughout all of Keen's thyroid tissues, compatible with thyroid disease, but no evidence of a cystic or solid mass; normal kidneys, pancreas, and gallbladder; and possible mild diffuse fatty infiltration in the liver. Id. On August 24, 2009, Keen saw Ms. Bowra again, complaining of fatigue (Tr. 191-92). Ms. Bowra diagnosed Keen with fatigue, splenomegaly, nonspecific abnormal results of function study of liver, systemic lupus erythematosus (SLE), anemia, unspecified, hypothyroidism, unspecified. Id. On August 26, 2009, Keen underwent an MRI of her knee, which was unremarkable and showed no signs of defect (Tr. 206).

Ms. Bowra and/or her colleague, Debbie Moore, FNP, examined Keen three more times in 2009, once in September (Tr. 189-90) and twice in December (Tr. 185-88). At the September appointment, Ms. Bowra noted, inter alia, that Keen had an antalgic gait, but good coordination and reflexes (Tr. 189-90). At the December appointments, Ms. Moore noted Keen's gait and station examination without abnormalities, and unremarkable inspection and palpation of bones, joints, and muscles (Tr. 187-88).

Keen saw Dr. Farooque on four occasions in 2010 (Tr. 265-67, 328). At each appointment, Keen expressed frustration about her home situation and family. Id. At her

January appointment, Dr. Farooque "strongly advised her that she needs to change her home situation" (Tr. 267). At her May appointment, Keen told Dr. Farooque she is fixated with the number 11, needing to wash the dishes and other tasks eleven times (Tr. 266).

On January 22, 2010, Dr. Victor W. Isaac, a physical medicine rehabilitation and pain management specialist, examined Keen and found, inter alia, that Keen had a normal gait; full range of motion of lumbar spine and extremities; negative straight leg raise; negative FABER (Flexion, Abduction and External Rotation) test; negative facet loading; and stable ligaments (Tr. 225-26). According to Dr. Isaac's notes, Keen denied any current mechanical symptoms related to her knee pain, did not have any joint swelling, and felt her current medication was helping. Id. In February 2010, Keen told Dr. Isaac, inter alia, that she started experiencing neck pain and cramping (Tr. 223-24). Dr. Isaac's examination revealed the same unremarkable test results as the previous appointment, and he noted that he reviewed an MRI which showed only a mild disc bulge. Id. (emphasis added).

On March 19, 2010, Dr. Isaac noted "[s]he feels her pain in her neck is increasing and radiating down her right arm in a C5-C6 dermatomal distribution, her disc bulge on MRI, however, is on the left" (Tr. 221-22). His examination continued to show the same unremarkable test results as previous exams. Id. In April 2010, Dr. Isaac gave Keen two epidural anesthetic/steroid injections (Tr. 320-22). The next month, Keen told Dr. Isaac that the injections did not help and complained that her pain radiated down her left arm (Tr. 318-19). Dr. Isaac's examination revealed the same unremarkable results. Id.

On June 17, 2010, Dr. Issac noted that Keen complained of pain radiating down both arms (Tr. 316-17). A physical examination revealed normal gait; full range of motion of lumbar spine and extremities; negative Hoffman's sign; normal coordination and fine motor skills; and negative Spurling's test. Id. On July 22, 2010, Keen claimed her medication had been stolen and produced a police report, and Dr. Isaac's examination again revealed unremarkable test results (Tr. 314-15). Dr. Issac last examined Keen on August 20, 2010, and the examination revealed the same unremarkable results; Dr. Isaac recommended that Keen seek treatment from another pain clinic (Tr. 312-13).

On May 20, 2010, Dr. John T. Netterville, a state DDS physician, reviewed the medical evidence of record and prepared a residual functional capacity assessment (Tr. 227-35). Dr. Netterville opined that Keen could occasionally lift and/or carry about 20 pounds; frequently lift and/or carry about 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday, with no other limitations (Tr. 228-31). Dr. Netterville explained his medical findings and provided a list of medical evidence relied upon (Tr. 234). He further stated that the medical evidence of record

(i) did not document a definitive diagnosis of fibromyalgia with the specific listing of a minimum number of trigger points, (ii) did not support the allegation of chronic fatigue syndrome, (iii) indicated that Keen's hypothyroidism was treated on medication, (iv) showed that Keen's alleged symptoms are only partially credible, and (v) indicated that the functional restrictions alleged were disproportionate to the clinical findings. Id. In October 2010, Dr. Frank R. Pennington affirmed Dr. Netterville's opinion (Tr. 276).

On July 7, 2010, Dr. Jennifer Hanket, Psy D. and Jeffrey W. Viers, M.A., performed a psychological consultative examination of Keen (Tr. 241-45). They noted, inter alia, that contrary to her allegations of not being able to withstand being outside and in the sun, Keen appeared suntanned; she behaved "oddly"; she fabricated answers and responded in ways which may have been to exaggerate the symptoms of her illness; she would cover her face with her hands and say to herself "shut up…shut up" like she was hearing voices, however this seemed exaggerated and the examiner was not convinced that she was responding to internal stimuli; she incorrectly stated that May is the month after March (which, according to the examiners, was very unusual to miss); she did not appear paranoid during the interview; signs of psychosis were not convincing; and "the claimant's presentation did not appear consistent with reported symptoms at times" (Tr. 241-45). Dr. Hanket and Mr. Viers were "unable to rate the claimant's functioning in the following areas due to possible symptom exaggeration: understanding, communication, ability to take normal precautions, short-term memory, long-term memory, concentration/pace, ability to tolerate stress/adapt to change and social interaction" (Tr. 245).

On July 20, 2010, Dr. Jenaan Khaleeli, Psy. D., a state DDS physician, reviewed the medical evidence of record and prepared a mental residual functional capacity assessment and psychiatric technique (Tr. 247-64). Dr. Khaleeli found, inter alia, Keen had moderate functional limitations in the three areas of functioning (activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace); had no episodes of decompensation; and that Keen's allegations were inconsistent with the objective findings (Tr. 261-63). Specifically, Dr. Khaleeli stated that

> [t]he functional limitations described by the claimant demonstrate inconsistency throughout the case record. The claimant's [symptoms] and impairments would not singly or in combination prevent the claimant from completing work-like activities; however concentration, persistence and pace and social ability are somewhat impacted by the diagnoses and therefore would cause **moderate** limitations in basic work-like duties.

(Tr. 263). On October 18, P. Jeffrey Wright, Ph.D. affirmed Dr. Khaleeli's assessment (Tr.

7

277).

Ms. Moore examined Keen once during 2010 (Tr. 307). Keen's only complaint at the time was for left foot-toe nail fungus, and Ms. Moore's examination, including gait and station, indicated that Keen was in no apparent distress and had no abnormalities. Id.

Dr. Farooque examined Keen four times in 2011 (Tr. 324-27). At two of these appointments, Dr. Farooque noted that Keen was doing "better than what I have seen her before," "given all these things going on, she seemed to be doing better or at least holding things up fairly well," "she is not complaining that much," "she says her medications are doing okay" (Tr. 325-26). At the other two appointments, Dr. Farooque noted that Keen had increased complaints due to temporary outside stressors, including, at one appointment, her aunt dying the prior week, her daughter having a miscarriage, her grandmother being hospitalized after falling and breaking her hip (Tr. 327), and, at the other appointment, her daughter about to give birth without having medical insurance, her mother being committed to a nursing home after falling and fracturing her hip, and a storm damaging her house necessitating getting a new roof (Tr. 324).

The record does not indicate any other appointments in 2011 or 2012. The record ends with a letter from Dr. Farooque dated March 1, 2012 (Tr. 330). The letter states, inter alia, that Keen is "unable to focus and unable to retain any gainful employment." Id. The note references a visit that day; however, the record does not indicate any treatment by Dr. Farooque for 2012.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed

9

> impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional,

severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to properly consider all of her medically severe impairments; in improperly discounting the opinion of her treating psychiatrist, Dr. Farooque; in failing to conduct a function-by-function assessment in determining her physical RFC; and, in discounting the credibility of her subjective complaints. The undersigned finds error in the ALJ's treatment of Dr. Farooque's opinion, and in his consideration of plaintiff's psychiatric symptoms, and so recommends reversal of the ALJ's decision and remand for further administrative proceedings.

As the Sixth Circuit has explained, the opinion of a treating source is to be reviewed deferentially:

> The Commissioner has elected to impose certain standards on the treatment of medical source evidence. 20 C.F.R. § 404.1502. Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527[(c)]. If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527([c])(2)).
>
> Importantly, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the

11

weight we give [a] treating source's opinion." 20 C.F.R. § 404.1527([c])(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." Wilson, 378 F.3d at 544. Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule." Id. at 544-45.

Cole v. Astrue, 661 F.3d 931, 937-38 (6th Cir. 2011).

In the case at bar, plaintiff presented evidence of 14 office visits with Dr. Farooque from February 2008 to November 2011 (Tr. 265-75, 324-28), as well as a March 1, 2012 letter from Dr. Farooque summarizing her care and offering his opinion as to her employability. (Tr. 330) The letter states as follows:

> I have been seeing Ashley Keen in my office since February 2008. She was hospitalized at Middle Tennessee Mental Health Institute prior to that. She has been diagnosed with major depression, obsessive compulsive disorder, and the diagnosis was later changed as bipolar disorder. She has symptoms of full-blown bipolar disorder with psychotic features. She also has some evidence of attention deficit symptoms. She has lots of physical problems including lupus. She has acute panic anxiety symptoms. She came to see me today. It appears that she has waxing and waning of her symptom[s] at times and she is still having auditory hallucination[s], paranoia, anxiety, and mood swing[s]. In my opinion due to her acute and chronic psychiatric symptoms, she is unable to focus and unable to retain any gainful employment. She is currently taking two different antipsychotic medication[s] including Geodon 80 mg twice a day and chlorpromazine 400 mg at night, antidepressant medication Remeron 30 mg at night, and anti-anxiety medication Xanax 2 mg twice a day. I will see her in the office in another three months.

(Tr. 330)

In weighing the opinion evidence, the ALJ assigned great weight to the opinion of Dr. Jenaan Khaleei, Psy.D., a nonexamining consultant who opined that plaintiff's medical file revealed moderate mental limitations. (Tr. 19, 247-64) The ALJ then proceeded to give the following analysis of Dr. Farooque's opinions:

> On March 6, 2012, the claimant treating physician, Dr. Farooque opined that the claimant was "unable to focus and unable to retain any gainful employment." Whether the claimant is able to retain gainful employment is an administrative finding that may determine whether the claimant is disabled; therefore, under SSR 96-5p, it is an issue reserved to the Commissioner, and will not be given special significance in this decision. Dr. Farooque's opinion that the claimant is "unable to focus" is assigned little weight, by the undersigned, as it is inconsistent with his treatment notes, and other medical evidence of record. For example, on March 12, 2008 Dr. Farooque reported that the claimant's mental symptoms had moderately improved. The claimant admitted that the medication was helping and stated that things were looking better for her. It was not until the claimant's home environment became chaotic, and Dr. Farooque suspected that the claimant was noncompliant with her medication that the claimant's condition began to worsen. Dr. Farooque urged the claimant to change her stressful home environment at each visit; however, her condition was never severe enough for him to ask her to return earlier than a three-month follow-up. The claimant started showing signs of prescription drug abuse in January 2010, when she first admitted to taking extra Xanax. Dr. Farooque continued to prescribe Xanax, but took the claimant off Prozac. Dr. Farooque's treatment notes are not notes from which one could conclude that the claimant is totally disabled due to psychiatric symptoms and mental limitations. Instead, it appears the claimant's condition is situational in nature, and should improve with a change in her home environment.

(Tr. 20)

With all due respect to the ALJ, the above description of Dr. Farooque's

treatment notes is a complete mischaracterization of their import, when in fact those notes neither support the ALJ's conclusion that plaintiff's "condition is situational in nature," nor the conclusion he ascribed to Dr. Farooque, that plaintiff's mental health would improve if only "she would change her stressful home environment, and stay compliant with her medications." (Tr. 20) In support of his conclusion that Dr. Farooque's assessment of plaintiff's inability to focus is inconsistent with his treatment records, the ALJ cites the March 12, 2008 report of moderate improvement and "admi[ssion] that the medication was helping and [] that things were looking better for her." Id. However, the ALJ fails to mention that March 12, 2008 marked only the second time that plaintiff visited Dr. Farooque (Tr. 273), and that the moderate improvement noted on that date was relative to her condition one month earlier, at her initial psychiatric evaluation by Dr. Farooque, when she was unmedicated and coming off of a recent, overnight psychiatric hospitalization at Middle Tennessee Mental Health Institute after threatening to commit suicide. (Tr. 274-75) Moreover, Dr. Farooque only once indicated that he was "kind of doubtful" about plaintiff's medication compliance (Tr. 271); otherwise, there is no indication in his treatment notes that plaintiff failed to take her prescribed medications. Therefore, the ALJ's statement that this suspicion of noncompliance corresponded with a downturn in plaintiff's condition is not supported. While the ALJ stated that Dr. Farooque "urged the claimant to change her stressful home environment at each visit" (Tr. 20), it appears that in fact such advice was given at only one visit, on January 6, 2010. (Tr. 267) As to the ALJ's reference to plaintiff's "signs of prescription drug abuse" and Dr. Farooque's subsequent decision to discontinue her prescription for Prozac (Tr. 20), with the intimation that the former caused the latter, it is clear from the records that plaintiff took additional Xanax in an effort to combat her

14

increased anxiety symptoms (Tr. 266-67), and that Prozac was discontinued not because of any drug abuse, but in order to change medications (adding Luvox CR and increasing chlorpromazine) to address increased symptoms of OCD. (Tr. 266)

The ALJ's overview of Dr. Farooque's treatment notes as not indicating total disability due to "psychiatric symptoms and mental limitations" evokes the recurring theme of the government's argument on this issue: that those notes reflect Dr. Farooque "simply recording statements from Keen and noting diagnoses based on those statements apparently without any objective tests being performed." (Docket Entry No. 17 at 18) These positions ignore or gloss over the instances where Dr. Farooque offered his clinical observation of plaintiff's anger or labile mood (Tr. 265, 266, 267, 268, 269, 271, 274), talking in an unusually loud voice (Tr. 267, 269, 324, 326, 327), racing thoughts (Tr. 272), and paranoia (Tr. 324), not to mention the instances where he accepted her report of hearing voices (Tr. 266, 267, 272, 274). Moreover, the Sixth Circuit has long observed that

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment ... consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.... In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting Poulin v. Bowen, 817

15

F.2d 865, 873-74 (D.C. Cir. 1987)); see also, e.g., Keeton v. Comm'r of Soc. Sec., 583 Fed. Appx. 515, 526 (6th Cir. Oct. 14, 2014). The government's repeated call for objective test results and laboratory findings supporting Dr. Farooque's diagnoses and opinions is thus misplaced.

Finally, with the finding that "the claimant's condition is situational in nature, and should improve with a change in her home environment" (Tr. 20), the ALJ has veered into the realm of medical expertise without qualification to do so. Nowhere in the medical record are plaintiff's mental impairments diagnosed as situational. Rather, plaintiff suffers from clinical, as opposed to situational, depression, mania, and anxiety. As Dr. Farooque recited, "[s]he has been diagnosed with major depression, obsessive compulsive disorder, and the diagnosis was later changed as bipolar disorder. She has symptoms of full-blown bipolar disorder with psychotic features." (Tr. 330) Indeed, the diagnoses of "[m]ajor depression, recurrent, with psychotic feature[s]" and "[p]anic disorder without agoraphobia" were given by Dr. Farooque (Tr. 275) and accepted by Dr. Khaleeli (Tr. 254, 263), to whose opinion the ALJ assigned great weight. Plaintiff was diagnosed with "bipolar I disorder, most recent episode manic, severe with psychotic features mood-congruent" in 2009 by the professionals at Guidance Mental Health Center.[2] (Tr. 282, 290, 294, 299, 301, 305) Even the consultative examiner, Mr. Jeffrey W. Viers, M.A., who suspected that plaintiff was exaggerating her symptoms to obtain disability benefits and so declined to give an opinion on her functional abilities, observed that plaintiff "was very hyperactive with pressured speech and

---

[2]These professionals also diagnosed OCD and made repeated reference to plaintiff's poor concentration, inability to complete tasks, and difficulty tracking conversation. (Tr. 283-84, 293, 298, 302) The ALJ does not appear to have taken note of these treatment records from April-July 2009, as they are not mentioned in his decision.

16

circumstantial thinking ... like those who suffer from bipolar disorder" (Tr. 243), and gave the "rule out" diagnosis of "Bipolar Disorder with Psychotic Features vs. Schizoaffective Disorder, Bipolar Type (should be corroborated by treatment records)." (Tr. 244) By not recognizing these diagnosed impairments as severe (Tr. 14), and by reducing their symptoms to "situational" (and thus, in the ALJ's estimation, readily subject to improvement[3]) in his determination of plaintiff's residual functional capacity, the ALJ has materially erred. Cf. White v. Comm'r of Soc. Sec., 572 F.3d 272, 284 (6th Cir. 2009) ("The ALJ should not have labeled White's depression during the pre-November 4, 2002 time frame as "situational" because there is no basis in the record for concluding that White's depression was primarily caused by her personal problems as opposed to her mental disorders. *See* S.S.R. 86–8 ("Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence.") A person's personal problems and his or her mental disorders cannot always be so neatly disentangled."); Lawrence v. Astrue, 2009 WL 2461223, at \*10 (S.D. Ohio Aug. 11, 2009).

The government in its brief has attempted to spotlight other medical evidence which contradicts the opinion of Dr. Farooque. (Docket Entry No. 17 at 19) The

---

[3]It is unclear to the undersigned how plaintiff would be expected to eliminate the stress from the chaotic home environment she reported to Dr. Farooque, which consisted of, e.g., her mother, who also suffers from bipolar disorder and OCD, living with her; a broken relationship with her husband, who left the home; one teenage daughter who was living at home while attending college and was described as doing well until becoming pregnant at age 18 and subsequently miscarrying; another teenage daughter who was diagnosed with bipolar disorder and in trouble with the law before dropping out of school at age 16 and becoming pregnant at age 17; and, a 10-year-old daughter who was having significant problems secondary to ADHD and bipolar disorder diagnoses. Essentially, the ALJ treated this case as one in which the plaintiff failed to follow prescribed treatment by "chang[ing] her stressful home environment." (Tr. 20) This was error.

17

government calls attention to the report of Mr. Viers,[4] who disbelieved plaintiff's report of psychotic symptoms and felt that plaintiff was exaggerating her limitations during mental status examination. The government further states that, "[u]pon reviewing the full medical record," Dr. Khaleeli found that plaintiff inconsistently reported her functional limitations. Id. However, Dr. Khaleeli's notes make explicit reference to only two items in the record: Dr. Farooque's treatment notes and Mr. Viers's report. (Tr. 263) The only other inconsistency which the government (though not the ALJ) identifies in the medical record is the fact that "on February 12, 2008, Keen reported to Dr. Farooque that she was fixated with the number seven (Tr. 274). However, she told Dr. Raggio [on April 30, 2009], that she was fixated with the number eleven and had to do everything eleven times (Tr. 300)." (Docket Entry No. 17 at 19) Dr. Raggio's treatment note was included in the evidence from the Guidance Mental Health Center, which the ALJ did not recognize (see n.1, supra). In any event, these allegedly inconsistent reports of plaintiff's fixations with the number of her repetitive behaviors were not given in the same week, month, or even year. Presumably such OCD fixations would be subject to change over the 14-month period which spanned these reports. Thus, the only inconsistency of any substance in the record medical evidence is between the treating psychiatrist's observations and opinions, and those of the consultative

---

[4]The government refers to this report as though it were rendered by both Mr. Viers and Dr. Jennifer Hanket, Psy.D., following their joint examination of plaintiff. (Docket Entry No. 17 at 19, 23 ("Finally, two examining psychology professionals could not even evaluate Keen because of her possible symptom exaggeration, malingering, and missing simple answers to questions.")) However, it is clear that Mr. Viers examined plaintiff and recorded his observations, which Dr. Hanket then countersigned. The report is on Mr. Viers's letterhead (Tr. 241), and is written from the perspective of "the examiner," singular. (Tr. 243, 245) Although Dr. Hanket presumably endorsed Mr. Viers's conclusions after a thorough review of his report, there is no indication that Dr. Hanket personally examined plaintiff or provided her signature after reviewing a recording of the clinical interview.

18

psychological examiner. As noted by the Sixth Circuit in Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 377 (6th Cir. 2013), this is not a sufficient inconsistency to justify refusing to accord the treating source's opinion controlling weight, pursuant to 20 C.F.R. § 404.1527(c)(2).

Even assuming *arguendo* that Dr. Farooque's opinion is not entitled to controlling weight, the undersigned nevertheless finds that the ALJ has failed to give good reasons, supported by the evidence in the record, for the weight he assigned to Dr. Farooque's opinion that she is unable to focus because of her "acute and chronic psychiatric symptoms," including "waxing and waning" symptoms such as "auditory hallucination[s], paranoia, anxiety, and mood swing[s]." (Tr. 330) The error is not harmless, and the decision in this case is not supported by substantial evidence. The matter should be remanded for further administrative consideration of the impact of plaintiff's mental limitations on her ability to work.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections

filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 2nd day of October, 2015.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE